# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number: 2024-NMSC-002**

**Filing Date: December 22, 2023**

**No. S-1-SC-38948**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**EDDIE M. MARES,**

      Defendant-Appellant.

**CERTIFICATION FROM THE NEW MEXICO COURT OF APPEALS**
**John Dean Jr., District Judge**

Bennett J. Baur, Chief Public Defender
Luz C. Valverde, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
John Kloss, Assistant Attorney General
Santa Fe, NM

for Appellee

## OPINION

**VARGAS, Justice.**

**{1}**    Defendant Eddie Mares signed a waiver of his *Miranda* rights and agreed to speak with police after he requested an attorney at his felony first appearance, after he was appointed an attorney, and even after his appointed attorney advised him not to speak to police. In this case, we determine that the police did not violate Defendant's right to counsel under the Sixth Amendment to the United States Constitution by interviewing him. As the United States Supreme Court made clear in *Montejo v. Louisiana*, 556 U.S. 778 (2009), police may initiate contact with a represented defendant and seek to obtain the defendant's statement and waiver of counsel outside the presence of counsel. This is the rule even when the defendant previously asserted

the right to counsel in open court, *id.* at 797, and even when the defendant does not consult with counsel about the wisdom of waiver before deciding to waive, *id.* at 786. Under *Montejo*, "the decision to waive [the Sixth Amendment right to counsel] need not itself be counseled. And when a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick." *Id.* (citation omitted).

{2}     We consider the question on certification from the Court of Appeals, which perceived an apparent conflict between this Court's prior precedent construing the Sixth Amendment and the later-decided rule in *Montejo*. Order of Certification to the New Mexico Supreme Court, *State v. Mares*, A-1-CA-37950 (N.M. Ct. App. June 4, 2021); *see also* NMSA 1978, § 34-5-14(C) (1972) (allowing the Court of Appeals to certify to this Court "a significant question of [constitutional] law" or "an issue of substantial public interest"). In addition to resolving the substantive Sixth Amendment issue, we take this opportunity to clarify the parameters for certification from the Court of Appeals under Section 34-5-14(C). We hold that the Court of Appeals should certify an issue when it appears that our precedent directly controls that issue and is contrary to later United States Supreme Court precedent. We further clarify that we accept certification of issues rather than cases, thus abrogating *Collins ex rel. Collins v. Tabet*, 1991-NMSC-013, ¶ 46 n.10, 111 N.M. 391, 806 P.2d 40, and *Rhein v. ADT Auto.*, 1996-NMSC-066, ¶ 2, 122 N.M. 646, 930 P.2d 783.

{3}     We recognize that the United States Supreme Court's opinion in *Montejo* is controlling precedent under which Defendant's Sixth Amendment rights were not violated, and to the extent that *State v. Desnoyers*, 2002-NMSC-031, 132 N.M. 756, 55 P.3d 968, *abrogated on other grounds by State v. Forbes*, 2005-NMSC-027, ¶ 6, 138 N.M. 264, 119 P.3d 144, conflicts with *Montejo*, *Desnoyers* is overruled. We do not reach the question of whether Article II, Section 14 of the New Mexico Constitution provides greater protection because that question was not properly preserved. We remand the remaining issues raised by Defendant's appeal to the Court of Appeals.

## I.      BACKGROUND

## A.      Factual Background

{4}     At his first appearance on charges of criminal sexual penetration of a minor, Defendant requested counsel to assist in his defense, and the court appointed counsel. Counsel advised Defendant not to speak with anyone about the case, including police. The following day, notwithstanding the fact that Defendant was represented by counsel, police interviewed Defendant in jail.

## 1.      The interview

{5}     At the start of the interview, police stated multiple times that they "want[ed] to hear [Defendant's] side of the story" and implied that if they knew his side of the story, they could help Defendant counter media and social media narratives about Defendant's guilt. They invited Defendant to ask his own questions, because

"[i]nformation goes both ways." Defendant asked why police had put his information in the news and on social media, and stated that he had already lost his job and his house due to the charges against him. The police offered to answer his questions once Defendant waived his *Miranda* rights, stating:

> We can talk about all that, okay? I apologize that it put you in a bad spot. That's never my intent, okay? Um, but to start off, since you're here in jail, we do have to go over your rights, okay? And you've heard them before. You do have the right to remain silent. Anything you say can and will be used against you. You have the right to a lawyer, and if you cannot afford a lawyer, one will be provided by, for free. By signing this, you're saying you understand these rights and voluntarily waive them, will answer questions. Um, that being said, if you sign this, you have the right to not talk to us at any point in time. So if you become uncomfortable or whatever, then just bring it up and you can stop talking to us. Does that make sense?

**{6}** Defendant signed the waiver. Defendant then told police that counsel "told me not to, not to even actually talk to you guys, period. . . . [T]hat's their advice, like don't talk to anybody besides us. . . . But like I said, I have nothing to hide." The police downplayed counsel's advice, stating, "They always say that. They always say that though anyway. That they know something that's in your benefit to talk to us. Like the lawyers that say, 'Don't talk to cops!' Like oh, sometimes they want to hear your side of the story."

**{7}** Subsequently, Defendant made several statements that could be construed as incriminating. When confronted with the victim's story, Defendant responded, "I don't know. I mean, okay. I mean if it happened, I mean it happened. But from my thoughts, I didn't touch her." Defendant agreed with an officer's suggestion that it was "possible" that Defendant could not remember some of the night's events because he had too much to drink. When police asked whether Defendant had penetrated the victim with "just fingers rather than full on," Defendant replied, "To be honest, I cannot tell you exactly. I couldn't tell you exactly. And to be honest, this conversation does make me uncomfortable because that is my daughter, and it's uncomfortable." An officer replied, "There's no way around it being uncomfortable. But we gotta talk about it at the same time. I guess we're kind of stuck here, trying to figure it out together."

**{8}** At one point, police told Defendant that "we're here to help you." Defendant stated, "Everything in my brain right now is telling me that I shouldn't be talking to you," to which police replied, "And that's the strong thing, don't ever talk to the cops. Man, like you say. . . [y]our side of the story needs to get out there, dude." Another officer stated, "People get so messed up, like, 'oh shit. [M]aybe I shouldn't talk to the po,'" but "[your] situation [is] not going to get any worse" by talking to police because "the charges are already filed. . . . You're not going to have more charges. No, that's not the case. We're just here to find out what happened and to get the truth out."

## 2. District court proceedings

**{9}** The State filed a motion to admit Defendant's statements to police. The State argued that the police interview did not violate Defendant's Sixth Amendment right to counsel pursuant to *Montejo*. Defense counsel filed a motion to suppress the statements, arguing in relevant part that *Montejo* did not control this case because it was factually distinguishable.

**{10}** Prior to the suppression hearing, the parties stipulated to the following timeline of events: (1) the criminal complaint was filed on May 19, 2017; (2) one month later, on June 18, Defendant was arrested; (3) the following day, June 19, Defendant applied for a public defender, the district court ordered the appointment of counsel, Defendant met with an attorney from the public defender's office, and that attorney instructed Defendant not to speak with anyone; (4) the following day, June 20, police spoke to Defendant in jail.

**{11}** The district court denied Defendant's motion to suppress and granted the State's motion to admit Defendant's statements. The district court concluded that "[u]nder the federal constitution, this issue is controlled by *Montejo*" and "Defendant has not presented to the court any argument or law that the New Mexico state constitution would provide greater protection than the federal constitution."

**{12}** The jury convicted Defendant on two counts of criminal sexual penetration of a minor. The district court sentenced Defendant to thirty years in prison.

## 3. Defendant's appeal

**{13}** Defendant appealed to the Court of Appeals, arguing that (1) police interviewed him in violation of his right to counsel under the Sixth Amendment because Defendant asserted his right to counsel at his first appearance and was represented by counsel at the time of the interview and (2) the district court improperly denied the jury's request to review transcripts of Defendant's interview with police. Defendant also raised a cursory argument that police violated his Fifth Amendment right to silence because they did not stop the interview when Defendant said that he felt "uncomfortable."

## B. Certification from the Court of Appeals

**{14}** The Court of Appeals issued an order of certification to this Court because it determined that this case presented two issues of substantial public interest and a significant question of constitutional law. Order of Certification at 3, *Mares*, A-1-CA-37950 (citing Section 34-5-14(C)). First, the Court of Appeals reasoned that an issue of substantial public interest is presented by the apparent conflict between the Sixth Amendment rule discussed by this Court in *Desnoyers*, 2002-NMSC-031, ¶ 16 (recognizing the Sixth Amendment rule from *Michigan v. Jackson*, 475 U.S. 625 (1986)), and the subsequent precedent of the United States Supreme Court, *Montejo*, 556 U.S. at 797 (overruling *Jackson*). Order of Certification at 3-6, 12, *Mares*, A-1-CA-37950. Second, the Court of Appeals reasoned that there is apparent doctrinal tension in New Mexico case law regarding the Court of Appeals' power to depart from our precedent,

which presents both an issue of substantial public interest and a significant question of law under the New Mexico Constitution. *Id.* at 7-12.

## C.     The Case Before This Court

**{15}**    We accepted certification of both issues and ordered supplemental briefing to "update the briefs filed in the Court of Appeals and address any new points raised in the Court of Appeals' certification order." In the supplemental briefing, the parties elaborated upon each issue raised in the Court of Appeals case—including those issues that we did not certify—but did not address the procedural issue raised in the certification order. For the reasons given in the discussion that follows, we instruct the parties in future certification cases to cabin their arguments to the certified issues.

**{16}**    Defendant makes the following arguments before this Court: (1) his statements should have been suppressed because under a narrow reading, the holding of *Montejo* does not apply to this case; (2) Article II, Section 14 of the New Mexico Constitution provides greater protection than the Sixth Amendment, and therefore Defendant's waiver of counsel should be invalid under Article II, Section 14; (3) police violated Defendant's Fifth Amendment right to silence by continuing the interrogation after Defendant attempted to stop it; and (4) the district court erred by denying the jury's request to review the transcript of Defendant's interview with police.

**{17}**    The State argues that (1) the district court properly admitted Defendant's statements because Defendant waived his Sixth Amendment rights through his waiver of *Miranda* rights; (2) the district court did not err in denying the jury's request to review the transcript of Defendant's interview with police; and (3) Defendant did not preserve his argument under Article II, Section 14, which should not be construed more broadly than the Sixth Amendment.

**{18}**    In this opinion, we also address the procedural issue certified by the Court of Appeals, which the parties did not address. The Court of Appeals identified doctrinal tension in our case law regarding that Court's ability to depart from this Court's precedent when there is an apparent conflict between our precedent and that of the United States Supreme Court. Order of Certification at 7-8, *Mares*, A-1-CA-37950. One line of cases would allow the Court of Appeals to depart from our precedent only if our precedent is dicta. *Id.* (citing *State v. Dopslaf*, 2015-NMCA-098, ¶ 11, 356 P.3d 559; and *State v. Bazan*, 1977-NMCA-011, ¶ 15, 90 N.M. 209, 561 P.2d 482). A second line of cases would allow the Court of Appeals to depart from our precedent if our precedent did not decide the precise issue involved in the current case. *Id.* at 8-9 (citing *State v. Duarte*, 2004-NMCA-117, ¶ 12, 136 N.M. 404, 98 P.3d 1054). We address and resolve this tension.

## II.     SUBSTANTIVE ISSUE PRESENTED ON CERTIFICATION

**{19}**    We begin by addressing the substantive issue presented on certification and hold that the Sixth Amendment was not violated when Defendant waived his *Miranda* rights and agreed to speak with police despite being represented by counsel. We further

conclude that Defendant did not preserve his state constitutional claim of additional protections under Article II, Section 14. Finally, we address the procedural questions surrounding the certification of cases under Section 34-5-14(C).

## A. Police Did Not Violate Defendant's Sixth Amendment Rights When Defendant Agreed to Speak with Them After He Requested Counsel at His First Appearance

**{20}** It is clear that Defendant's Sixth Amendment right to counsel had already attached at the time he was interviewed in jail: Defendant had been criminally charged, he had been haled into court for his first appearance, he requested counsel, and he was appointed counsel by the court. *See Brewer v. Williams,* 430 U.S. 387, 398 (1977) (holding that the Sixth Amendment right to counsel attaches "at or after the time that judicial proceedings have been initiated against" a defendant). Thus the question in this case is not whether Defendant had the right to counsel under the Sixth Amendment at the time of his interrogation by police—he undeniably did. *See Montejo*, 556 U.S. at 786 (explaining that the Sixth Amendment guarantees the right to the assistance of counsel "at all critical stages of the criminal proceedings. Interrogation by the State is such a stage" (internal quotation marks and citations omitted)). Instead, the question is whether Defendant waived that right and whether his request for counsel at his first appearance invalidated such a waiver.[1] "The standard of review for suppression rulings is whether the law was correctly applied to the facts, viewing them in a manner most favorable to the prevailing party. . . . We review de novo the district court's application of the law to those facts." *State v. Madonda*, 2016-NMSC-022, ¶ 15, 375 P.3d 424 (brackets, internal quotation marks, and citations omitted).

## 1. *Montejo* overruled *Jackson* and is binding United States Supreme Court precedent

**{21}** In *Jackson*, the United States Supreme Court established a bright-line rule that after a defendant requests counsel "at an arraignment or similar proceeding," any subsequent waiver of counsel made to police is "invalid" if the police initiated contact with the defendant. 475 U.S. at 636. In *Montejo*, the United States Supreme Court rejected that rule. 556 U.S. at 797 (overruling *Jackson*). In stark contrast to *Jackson*, *Montejo* established a new Sixth Amendment analysis under which a defendant's invocation of the right to counsel in an initial court proceeding is not relevant to whether the defendant subsequently waived that right in a police-initiated interrogation. *See* 556 U.S. at 797 (noting that the defendant cannot invoke the right to counsel "anticipatorily," and stating that "[w]hat matters . . . is what happens when the defendant is approached for interrogation, and (if he consents) what happens during the interrogation—not what happened at any preliminary hearing" (internal quotation marks and citation omitted)).

**{22}** In place of *Jackson*'s bright-line rule, *Montejo* held that "the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is

---

1 Defendant does not contend that he was coerced into giving the statement by virtue of police tactics, and that issue is not before us. *See State v. Evans*, 2009-NMSC-027, ¶ 46, 210 P.3d 216 (recognizing that there is a point in which police threats, promises or deception can cross the line into coercion).

voluntary, knowing, and intelligent." *Id.* at 786. A voluntary, knowing, and intelligent waiver may be given "whether or not [the defendant] is already represented by counsel," and whether or not the defendant has discussed the waiver with counsel: "the decision to waive need not itself be counseled." *Id. Montejo* thus focused the waiver analysis on a defendant's freedom of choice. To prohibit a defendant from waiving the right to counsel outside of court and counsel's presence, *Montejo* reasoned, would be to "imprison a man in his privileges and call it the Constitution." *Id.* at 788 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 280 (1942)).

{23}    Moreover, *Montejo* made clear that when police read a defendant the *Miranda* warnings and the defendant waives counsel after receiving those warnings, the defendant's waiver is deemed knowing, intelligent, and voluntary. *Id.* at 786-87. A defendant who has received *Miranda* warnings "'has been sufficiently apprised of the nature of [the defendant's] Sixth Amendment rights, and of the consequences of abandoning those rights, so that [the defendant's] waiver on this basis will be considered a knowing and intelligent one.'" *Id.* (quoting *Patterson v. Illinois*, 487 U.S. 285, 296 (1988)). "Since the right [to counsel] under both [the Fifth and Sixth Amendments] is waived using the same procedure, doctrines ensuring voluntariness of the Fifth Amendment waiver simultaneously ensure the voluntariness of the Sixth Amendment waiver." *Id.* at 795 (citation omitted). As legal scholars have succinctly summarized, under *Montejo*, "As long as the police give the *Miranda* warnings . . . and the suspect validly waives the right to counsel, that will now suffice for Sixth Amendment purposes." Barbara E. Bergman, Theresa M. Duncan & Marlo Cadeddu, 3 Wharton's Criminal Procedure § 15:14 (14th ed. June 2023 update).

## 2.    Defendant waived his right to counsel after receiving *Miranda* warnings; under *Montejo*, that waiver was valid for Sixth Amendment purposes

{24}    Under *Montejo*'s Sixth Amendment framework, Defendant knowingly, intelligently, and voluntarily waived his right to counsel through his waiver of *Miranda* rights. As part of the *Miranda* warnings, police informed Defendant that he had the right to counsel and that counsel would be provided for free. Thus, Defendant is deemed to have known that he had the right to an attorney and is deemed to have intelligently and voluntarily waived that right. "[W]hen a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick" to show that a waiver of counsel was knowing, intelligent, and voluntary. *Montejo*, 556 U.S. at 786; *see also Patterson*, 487 U.S. at 299-300 (holding that a valid *Miranda* waiver is sufficient to waive the Sixth Amendment right to counsel in the context of postindictment custodial interrogation).

{25}    The facts of this case provide even more support for the conclusion that Defendant's waiver was knowing, intelligent, and voluntary, beyond the simple fact that Defendant was given *Miranda* warnings. In this case, Defendant knew that he had the right to counsel because he had been appointed an attorney and had discussed with that attorney *the very scenario* under which Defendant ultimately provided the waiver of counsel. As Defendant stated, his attorney "told me not to, not to even actually talk to you guys, period . . . don't talk to anybody besides us." Thus, not only is Defendant

deemed to have known, but Defendant *actually* knew that he had no obligation to speak to police: his attorney expressly told him so. Defendant's choice to go against his attorney's advice and speak with police was therefore intelligent and voluntary. As Defendant stated, he freely chose to speak with police because he felt that he had "nothing to hide."

**{26}**    We conclude that under *Montejo*, Defendant's waiver was valid. Defendant made a knowing, intelligent, and voluntary choice to engage with police and waive his right to counsel notwithstanding counsel's advice. *Montejo* abolished any presumption that Defendant's earlier assertion of the right to counsel at his first appearance invalidates the waiver that Defendant made to police. 556 U.S. at 787, 797. Therefore, we hold that Defendant's statements to police were not taken in violation of his Sixth Amendment right to counsel. We affirm the district court's ruling that Defendant's statements were admissible at trial.

**B.    We Do Not Reach the Issue of Whether Article II, Section 14 Provides Greater Protections Than the Sixth Amendment Because Defendant Did Not Preserve This Issue**

**{27}**    "To preserve an issue for review, it must appear that a ruling or decision by the trial court was fairly invoked." Rule 12-321 NMRA. When a defendant seeks additional protections under our state constitution that are not available under the federal constitution, we have different preservation requirements depending upon whether the relevant state constitutional provision has previously been interpreted more broadly than its federal counterpart. *See generally State v. Gomez*, 1997-NMSC-006, ¶¶ 22-23, 122 N.M. 777, 932 P.2d 1 (establishing a different standard for a constitutional provision with established precedent than for one with no precedent). Specifically,

> Where a state constitutional *provision* has previously been interpreted more expansively than its federal counterpart, trial counsel must develop the necessary factual base and raise the applicable constitutional *provision* in trial court. Where the provision has never before been addressed under our interstitial analysis, trial counsel additionally must argue that the state constitutional provision should provide greater protection, and suggest reasons as to why.

*State v. Leyva*, 2011-NMSC-009, ¶ 49, 149 N.M. 435, 250 P.3d 861. We emphasize that this argument must be made "*in the trial court*" and should not be withheld for appeal. *Gomez*, 1997-NMSC-006, ¶ 23. "This will enable the trial court to tailor proceedings and to effectuate an appropriate ruling on the issue." *Id.*

**{28}**    Defendant argues that he preserved the state constitutional claim because trial counsel cited Article II, Section 14 in her motion to suppress. Apart from that citation, however, trial counsel did not mention the New Mexico Constitution. Trial counsel did not show that Article II, Section 14 "has previously been interpreted more expansively than its federal counterpart" or "additionally . . . argue that the state constitutional provision should provide greater protection, and suggest reasons as to why." *Leyva*,

2011-NMSC-009, ¶ 49. Therefore, under *Gomez* and *Leyva*, Defendant has not met his burden to show that his constitutional claim under Article II, Section 14 was preserved.

**{29}** On appeal, Defendant urges that we should reach the state constitutional issue despite the lack of argument below because this issue implicates Defendant's "fundamental rights and the general public interest to be free from police interrogation without the assistance of counsel, after counsel has been retained." Although we have the discretion to consider unpreserved issues that involve the general public interest or fundamental rights, *see* Rule 12-321(B)(2)(a), (d), we do not accept Defendant's invitation to use that discretion to review his state constitutional claim. The process for raising and preserving state constitutional claims has been clearly established in *Gomez*, 1997-NMSC-006, and *Leyva*, 2011-NMSC-009. That process cannot be avoided by pointing out that constitutional rights are fundamental (they generally are) or that the public interest is served by announcing the scope of those rights (it generally is). Were we to adopt an exception to the constitutional preservation requirement whenever a state constitutional question involved fundamental rights or the general public interest, the exception would swallow the rule set forth in *Gomez* and *Leyva*. Instead, we adhere to that precedent and reiterate that state constitutional claims must be properly preserved at the trial level if litigants wish those claims to be considered on appeal.

**{30}** We do not reach the issue of the scope of Article II, Section 14 because it was not properly preserved in the trial court. However, *Montejo* does not preclude states from adopting a more stringent approach to waiver of counsel in the context of police-initiated interrogations of defendants who have previously invoked the right to counsel in a court proceeding. *See* 556 U.S. at 783 (noting that "[the *Jackson*] rule would apply well enough in States that require the indigent defendant formally to request counsel before any appointment is made"); *see also id.* at 793 ("If a State *wishes* to abstain from requesting interviews with represented defendants when counsel is not present, it obviously may continue to do so."). Our opinion today should not be understood to bar this issue, if properly developed in the trial court, from being raised on appeal in future cases.

## III. PARAMETERS OF CERTIFICATION FROM THE COURT OF APPEALS

**{31}** We now clarify the parameters of certification from the Court of Appeals under Section 34-5-14(C) and Rule 12-606 NMRA. First, we explain that the Court of Appeals is bound by our precedent that directly controls an issue. If our directly controlling precedent is in conflict with later United States Supreme Court precedent, then the Court of Appeals should certify the matter to us under Section 34-5-14(C). However, if our precedent does not directly control an issue, then the Court of Appeals is free to rule on that issue.

**{32}** Second, we determine that the "matter" certified under Section 34-5-14(C) refers to an issue rather than a case. In so doing, we abrogate *Collins*, 1991-NMSC-013, ¶ 46 n.10, and *Rhein*, 1996-NMSC-066, ¶ 2.

**A.** **The Court of Appeals Should Certify an Issue When Our Precedent Directly Controls That Issue and a Later United States Supreme Court Opinion Is Contra**

**1.** **Vertical stare decisis and the *Alexander* doctrine**

**{33}** It is axiomatic that our justice system requires strict adherence to vertical stare decisis, which is the principle that lower courts are bound by the precedent of reviewing courts. *See stare decisis*, *Black's Law Dictionary* (11th ed. 2019) (defining *vertical stare decisis* as "[t]he doctrine that a court must strictly follow the decisions handed down by higher courts within the same jurisdiction"); *see also* Evan H. Caminker, *Why Must Inferior Courts Obey Superior Court Precedents?*, 46 Stan. L. Rev. 817, 820 (1994) (stating that vertical stare decisis "constitutes a virtually undiscussed axiom of adjudication"); Charles J. Cooper, *Stare Decisis: Precedent and Principle in Constitutional Adjudication*, 73 Cornell L. Rev. 401, 402 n.6 (1987-88) (noting that "[t]here is no serious debate regarding [the] obligation [to respect vertical stare decisis], perhaps because the alternative is so obviously chaos"). The essence of vertical stare decisis is that "[a]bsent a formal overruling, Supreme Court decisions remain indefeasibly binding on all inferior tribunals; finding a precedent to be controlling brings the inquiry to its end." Randy J. Kozel, *The Scope of Precedent*, 113 Mich. L. Rev. 179, 203 (2014).

**{34}** This Court first explicitly enforced the requirement of vertical stare decisis in *Alexander v. Delgado*, in which we held that the Court of Appeals lacked authority to overrule this Court's precedent. 1973-NMSC-030, ¶ 9, 84 N.M. 717, 507 P.2d. 778 ("[T]he Court of Appeals is to be governed by the precedents of this [C]ourt."). Our recognition of vertical stare decisis, sometimes known as the *Alexander* doctrine, requires that the Court of Appeals follow this Court's precedent "even when a United States Supreme Court decision seems contra," *State v. Manzanares*, 1983-NMSC-102, ¶ 3, 100 N.M. 621, 674 P.2d 511, or when the Court of Appeals determines that this Court "would conclude that the precedent is no longer good law and would overrule it given the opportunity." *Aguilera v. Palm Harbor Homes, Inc.*, 2002-NMSC-029, ¶ 6, 132 N.M. 715, 54 P.3d 993 (internal quotation marks and citation omitted). We have noted that "the operative fact for the application of the *Alexander* rule is the existence of precedent from this Court on the matter, and it is not necessary for that precedent to have been reconsidered or reaffirmed." *State ex rel. Martinez v. City of Las Vegas*, 2004-NMSC-009, ¶ 22, 135 N.M. 375, 89 P.3d 47. And of course, "the existence of scholarly criticism of one of our opinions does not diminish its binding nature as precedent." *Id.* Thus vertical stare decisis, as recognized in the *Alexander* doctrine, requires absolute fealty to this Court's precedents by the Court of Appeals.[2]

---

[2] Federalism principles create one exception to vertical stare decisis within the state court system: that is, when the United States Supreme Court interprets a federal constitutional provision more expansively than this Court has previously recognized, the Court of Appeals may recognize the federal expansion of rights before this Court formally adopts those rights. *See Duarte*, 2004-NMCA-117, ¶ 12 ("Because *Crawford [v. Washington*, 541 U.S. 36 (2004)] interprets the federal constitution in a way that grants broader rights to

**{35}** Although the *Alexander* doctrine is absolute with regard to *whether* our precedent binds the Court of Appeals, we have rarely had occasion to consider the "interrelated but analytically distinct" question of "precedential scope, which determines whether a prior judicial statement applies to the dispute presently under consideration." Kozel, *supra*, at 185. In the above-cited cases, there was no question as to whether the Court of Appeals had violated vertical stare decisis by abrogating our binding precedent because, in each of those cases, the Court of Appeals had ruled directly contrary to our previous holdings. *See Alexander*, 1973-NMSC-030, ¶¶ 7, 12, 15-16 (disapproving of the Court of Appeals' manner of abolishing unavoidable accident as a defense and directing that a UJI on that topic no longer be given in direct contravention of our binding precedent); *see also Manzanares*, 1983-NMSC-102, ¶¶ 1-3, 6-7, 13 (reversing the Court of Appeals' refusal to apply a double jeopardy rule from *State v. James*, 1979-NMSC-096, 93 N.M. 605, 603 P.2d 715, in direct contravention of our binding precedent); *Aguilera*, 2002-NMSC-029, ¶¶ 1, 6 (reversing the Court of Appeals' holding that arbitrators have authority to award punitive damages in direct contravention to our binding precedent); *Martinez*, 2004-NMSC-009, ¶¶ 1, 18-20 (examining the Court of Appeals' refusal to apply the pueblo rights doctrine in direct contravention of our binding precedent).

**{36}** In only one case have we considered precedential scope. In *State v. Wilson*, 1994-NMSC-009, ¶¶ 4-6, 116 N.M. 793, 867 P.2d 1175, we held that the *Alexander* doctrine does not require the Court of Appeals to follow our uniform jury instructions when those instructions have never previously been challenged. In *Wilson*, the Court of Appeals determined that one of our uniform jury instructions omitted elements that were essential to the offense, but determined that under the *Alexander* doctrine the Court of Appeals lacked authority to question a uniform jury instruction that this Court had approved. *Id.* ¶¶ 24-26. We accepted certification of the case and held that "the Court of Appeals is *not* precluded from considering error in jury instructions, but is precluded only from overruling those instructions that have been considered by this Court in actual cases and controversies that are controlling precedent." *Id.* ¶ 4. As we explained:

> [W]e see no reason why the Court of Appeals should be precluded from questioning the validity of the instruction *just as it would any other precept not yet passed on by the Supreme Court.* Although this Court's adoption of uniform jury instructions proposed by standing committees of the Court establishes a presumption that the instructions are correct statements of law, that fact alone is not sufficient precedent to tie the hands of the Court of Appeals.

---

criminal defendants, we believe we are bound to follow it. For this reason, we are confident that our Supreme Court would adopt *Crawford*, and we accept this opportunity to adopt *Crawford* in New Mexico." (citation omitted)). That is because the federal constitution establishes a floor, not a ceiling, for individual rights, and our courts cannot curtail rights that have been granted by the federal constitution. *See Kilpatrick v. State*, 1985-NMSC-064, ¶ 7, 103 N.M. 52, 702 P.2d 997 ("Although individual states may provide broader rights under state constitutions than those required by similar provisions of the United States Constitution, states are not free to restrict those rights to something less than as guaranteed under the federal charter.").

Therefore, we hold that the Court of Appeals has authority to question uniform jury instructions in cases in which the instruction has not been challenged previously and to amend, modify, or abolish the instruction if it is erroneous.

*Id.* ¶¶ 5-6 (emphasis added). Thus, in the only case in which we directly confronted the question of the scope of our precedent under the *Alexander* doctrine, we rejected an expansive view of our precedent in favor of a more restrictive one.

**{37}** With this background in mind, we turn now to explain how the Court of Appeals should determine whether it is free to decide an issue or should certify the issue to us.

**2.    Under the *Alexander* doctrine, the Court of Appeals is bound to follow our precedent that directly controls an issue**

**{38}** Our cases construing the *Alexander* doctrine have not addressed the question of how the Court of Appeals is to determine the scope of our precedent's binding authority over it. This lack of clarity has led to the *Alexander* doctrine variously being interpreted to allow the Court of Appeals to decide an issue either when our precedent is "dicta" or when it has not decided the "precise issue" involved in the instant case. *Compare Dopslaf*, 2015-NMCA-098, ¶ 11 (concluding that our precedent discussing the holding of another case was "dicta and, as such, is not binding authority"), *and Bazan*, 1977-NMCA-011, ¶ 15 (concluding that the *Alexander* doctrine did not require the Court of Appeals "to follow the dicta" in a territorial case "when that dicta is based on an obvious confusion" between the evidentiary rules governing recorded recollection and refreshed memory), *with Duarte*, 2004-NMCA-117, ¶ 11 ("[W]e are given more latitude [under the *Alexander* doctrine] when the precise issue has not been already decided by our Supreme Court.").

**{39}** We do not endorse the former approach because it is notoriously difficult to distinguish dicta from holding, both in theory and practice. *See generally* Michael C. Dorf, *Dicta and Article III*, 142 U. Pa. L. Rev. 1997, 2005 (1994) ("As currently understood, the distinction [between holding and dicta] is almost entirely malleable."); *see also Manzanares*, 1983-NMSC-102, ¶¶ 2, 7 (disagreeing with the Court of Appeals' characterization of part of our precedent as "dicta" when in fact it was an alternative holding). The distinction is supposed to rest on whether a statement in an opinion is necessary to the decision: "holdings" being the necessary statements, and "dicta" being the unnecessary ones. *Compare holding*, *Black's Law Dictionary* (11th ed. 2019) ("A court's determination of a matter of law pivotal to its decision; a principle drawn from such a decision."), *with dictum*, *Black's Law Dictionary* (11th ed. 2019) (defining *obiter dictum* literally as "something said in passing," or figuratively as "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case"). But attempting to apply those definitions to real-world cases is not so simple. "Law is not an exercise in mathematical logic. And statements of a legal rule set forth in a judicial opinion do not always divide neatly into 'holdings' and 'dicta.'" *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 831 (2007) (Breyer, J., dissenting); *see also* Michael Abramowicz & Maxwell Stearns, *Defining Dicta*, 57

Stan. L. Rev. 953, 956 (2005) (noting that lawyers do not have a "shared conceptual foundation for analyzing [the distinction between dicta and holding in] even modestly complex cases").

**{40}** Moreover, the binary distinction between holding and dicta cannot fully capture the nuances of legal reasoning. Legal opinions can set forth important doctrines, synthesize new analytical frameworks, and establish procedural rules which are not strictly necessary to the decision in the case, but which nonetheless provide legal guidance that should be understood as binding. *See, e.g., Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995) (establishing the doctrine "that government may treat people differently because of their race only for the most compelling reasons"; therefore, "all racial classifications . . . must be analyzed by a reviewing court under strict scrutiny"); *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) (establishing a two-part analytical framework to determine whether an administrative agency correctly interpreted a statute); *Miranda v. Arizona*, 384 U.S. 436, 468-72 (1966) (establishing a procedural rule requiring that police officers provide specific warnings prior to custodial interrogation); *see also* Kozel, *supra*, at 182 (noting that precedent includes "elements of . . . prior opinions that extend far beyond the narrow application of a legal rule to a discrete set of facts," such as "doctrinal frameworks, elaborate judicial instructions, and broadly articulated rationales"). Thus the applied reasoning of an opinion, not only its narrow results, creates precedent. *See generally* Larry Alexander, *Constrained by Precedent*, 63 S. Cal. L. Rev. 1, 5 (1989) (discussing three competing models of precedential scope and arguing in favor of the "rule model," which includes the reasoning set forth in an opinion). "[T]he precedential force of an earlier case ultimately rests upon the reasons underlying the court's decision . . . because precedents derive their legitimacy from their reasoning." Dorf, *supra*, at 2059. Given these considerations, we conclude that the "holding/dicta" distinction is too ambiguous—and potentially too narrow—to serve as a useful model for determining the scope of our precedent.

**{41}** Instead, we take a more pragmatic approach. We hold that the Court of Appeals has the authority to depart from our precedent if our precedent does not directly control the issue in the case at bar. A precedential case is directly controlling if it "compel[s] the outcome" of the issue in the current case; that is, if the precedential case "answer[s] the definitive question" in the case at bar. *Lambrix v. Singletary*, 520 U.S. 518, 528 n.3 (1997). In other words, if we have not directly ruled on an issue in a manner that would be dispositive in the case at bar, the Court of Appeals is free to conduct its own analysis of the issue.

**{42}** Conversely, when we have directly ruled on an issue in a manner that would be dispositive in the case at bar, the Court of Appeals must apply that same rule to the case at bar. *See Martinez*, 2004-NMSC-009, ¶ 21 ("'[I]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case *which directly controls*, leaving to this Court the prerogative of overruling its own decisions.'" (emphasis added) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989))). In such cases, if the Court of Appeals determines that our previous ruling is in conflict with

later United States Supreme Court precedent, it should certify the issue to us pursuant to Section 34-5-14(C).

**{43}** This approach is consistent with our reasoning in *Wilson*, in which we held that the Court of Appeals was free "to amend, modify, or abolish" a uniform jury instruction as long as we had not "specifically address[ed] the validity of" the instruction in a precedential opinion. 1994-NMSC-009, ¶¶ 4-6. Our approval of a uniform jury instruction indicates that we have considered that instruction and determined that it appears to accurately state the law. *Id.* ¶ 5 ("[T]his Court's adoption of uniform jury instructions proposed by standing committees of the Court establishes a presumption that the instructions are correct statements of the law."). But under *Wilson*, that presumption "is not sufficient precedent to tie the hands of the Court of Appeals." *Id.* That is, the Court of Appeals is not bound by our initial determination that a uniform jury instruction accurately states the law unless and until we have actually applied that instruction to the facts of a case. *Id.* ¶ 4 ("[T]he Court of Appeals . . . is precluded only from overruling those instructions that have been considered by this Court in actual cases and controversies that are controlling precedent."). The Court of Appeals "does not have authority to alter an instruction that has been reviewed and ruled upon by this Court." *Id.* ¶ 6.

**{44}** Similarly, when we recognize a general principle of law in an opinion, it indicates that we have considered that principle and determined that it accurately states the law. But unless and until we have actually applied that principle to the facts of a case— unless that principle "has been reviewed *and ruled upon* by this Court"—the Court of Appeals is not necessarily bound by our determination. *Id.* (emphasis added); *see also Cohens v. Virginia*, 19 U.S. 264, 399-400 (1821) (noting, by Chief Justice Marshall, that "principles which may serve to illustrate" a proposition in a previous case "may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision"). That is, if our statement of a general principle of law in a precedential case did not directly control the outcome of that issue, "we see no reason why the Court of Appeals should be precluded from questioning the validity of" that principle, "just as it would any other precept not yet passed on by the Supreme Court." *Wilson*, 1994-NMSC-009, ¶ 5.

**{45}** We examine this case as an example. Here, the Court of Appeals could have applied *Montejo*—notwithstanding *Desnoyers*—because *Desnoyers* does not directly control the issue of whether Defendant could waive his Sixth Amendment right to counsel through a valid *Miranda* waiver. In *Desnoyers*, we noted the *Jackson* rule while explaining the general Sixth Amendment rule as it existed at the time. We did not, however, apply *Jackson* at any point. *Desnoyers* did not turn on the issue of waiver, but instead on the issue of whether the defendant properly asserted his right to counsel. 2002-NMSC-031, ¶¶ 16-17. Because we did not rule on waiver, *Desnoyers* does not directly control the waiver issue in this case. The Court of Appeals has the authority to decide such issues independently, without certification to this Court.

**B.      We Accept Certification of Issues Rather Than Cases**

**{46}**    The statute governing certification of cases to this Court, § 34-5-14(C), provides:

> The supreme court has appellate jurisdiction *in matters* appealed to the court of appeals, but undecided by that court, if the court of appeals certifies to the supreme court that *the matter* involves:
>
> (1)      a significant question of law under the constitution of New Mexico or the United States; or
>
> (2)      an issue of substantial public interest that should be determined by the supreme court.
>
> Any certification by the court of appeals under this subsection is a final determination of appellate jurisdiction.

(Emphasis added.)

**{47}**    We have previously held that the "matter" to be resolved on certification is the entire case rather than the discrete issue or issues identified in the order of certification. *Collins*, 1991-NMSC-013, ¶ 46 n.10 ("We construe the word 'matter' [in Section 34-5-14(C)] to mean the entire case in which the appeal is taken."); *see also Rhein*, 1996-NMSC-066, ¶ 2 ("On certification from the Court of Appeals we decide the entire case in which the appeal is taken." (citing *Collins*, 1991-NMSC-013, ¶ 46 n.10)). As such, this Court has generally decided all appellate issues in a certified case even when the majority of the issues present no certifiable questions. *See Collins*, 1991-NMSC-013, ¶¶ 46-52; *Rhein*, 1996-NMSC-066, ¶ 2; *but see State v. Walker*, 1993-NMSC-069, ¶ 3, 116 N.M. 546, 865 P.2d 1190 ("We limit our review of this case to the . . . issue for which it was certified . . . . For resolution of the other issues . . . , we remand this case to the Court of Appeals."). In a few instances, the Court of Appeals has proposed resolutions of the noncertified issues for our consideration, and we have adopted those proposals in our opinions. *See, e.g.*, *Wagner v. AGW Consultants*, 2005-NMSC-016, ¶ 32, 137 N.M. 734, 114 P.3d 1050 (appending the Court of Appeals certification order to the opinion and "adopt[ing] the Court of Appeals' analysis and conclusions regarding the remaining issues that were raised on appeal"); *see also, e.g.*, *Wilson*, 1994-NMSC-009, ¶ 7 (adopting and appending Court of Appeals' proposed disposition to our opinion to resolve remaining issues on appeal).

**{48}**    However, we do not perceive that the law mandates the conclusion drawn in *Collins* and *Rhein*. Certification under Section 34-5-14(C) is part of our discretionary jurisdiction. *See* N.M. Const. art. VI, § 2 (providing that we have mandatory jurisdiction over cases involving sentences of death or life imprisonment, but "[i]n all other cases, criminal and civil, the supreme court shall exercise appellate jurisdiction as may be provided by law"); *see also* Rule 12-102 NMRA (enumerating four types of appeals under our mandatory jurisdiction and noting that "[a]ll other appeals shall be taken to the Court of Appeals"). Thus, we have the discretion to accept or reject certification orders

issued by the Court of Appeals under Section 34-5-14(C). *See Martinez v. Chavez*, 2008-NMSC-021, ¶¶ 12-13, 144 N.M. 1, 183 P.3d 145 (per curiam) (holding that the Legislature cannot require this Court to accept as final the Court of Appeals' determination of appellate jurisdiction because this Court has inherent power to review all rulings of the Court of Appeals). Moreover, the term "matter" is used in the same statute to describe that which we accept on certiorari, *see* § 34-5-14(B), and we grant certiorari to review issues, rather than cases, *see* Rule 12-502(C)(2)(b) NMRA (stating that "the Court will consider only the questions set forth in the petition") and Rule 12-502(C)(2)(d) (enumerating four bases for granting a writ of certiorari). Finally, we have the power to "limit the questions to be argued" in a certification case brought under Section 34-5-14(C). Rule 12-606. Therefore, there is no basis in statute or rule for the requirement that *Collins* and *Rhein* imposed on our certification jurisdiction. On the contrary, our statutes and rules allow us the discretion to accept or reject certification and to limit our review to defined questions.

**{49}** Additionally, we conclude that the requirement imposed by *Collins* and *Rhein* is not justified by prudential concerns. When we accept cases rather than issues on certification, we expand our scope of review beyond those issues that are eligible for certification under the criteria set forth in Section 34-5-14(C). In so doing, we assume the role of an error-correcting court. But the certification of cases under Section 34-5-14(C) is not intended for this Court to correct error. Section 34-5-14(C) is intended to allow our review of "a significant question of law under the constitution" or "an issue of substantial public interest that should be determined by the supreme court." Just as "it is improper for this Court to consider [on certiorari review] any questions except those set forth in the petition for certiorari," *Fikes v. Furst*, 2003-NMSC-033, ¶ 8, 134 N.M. 602, 81 P.3d 545, so too we conclude that it is improper for this Court to consider any questions on certification except those issues that the Court of Appeals certified to us and that we accept under the criteria set forth in Section 34-5-14(C).

**{50}** Accordingly, we now hold that we accept certification of and decide discrete issues rather than cases under Section 34-5-14(C). We direct future litigants to focus any supplemental briefing filed in this Court pursuant to Section 34-5-14(C) and Rule 12-606 to only the issue(s) certified. Any additional issue(s) will be remanded to the Court of Appeals.

## IV.     CONCLUSION

**{51}** Under the controlling United States Supreme Court precedent of *Montejo*, Defendant validly waived his Sixth Amendment right to counsel through his waiver of *Miranda* rights even though he had requested and obtained counsel at his first appearance. To the extent that our precedent in *Desnoyers* conflicts with *Montejo*, *Desnoyers* is now overruled. We do not reach the question of whether Article II, Section 14 would provide additional protections because Defendant did not preserve his state constitutional claim.

**{52}** In future cases involving an apparent conflict between our precedent and later United States Supreme Court precedent, the Court of Appeals may reach any issue

over which our precedent is not directly controlling. We clarify that we accept issues rather than cases on certification, thereby abrogating *Collins* and *Rhein*. In accordance with this holding, we remand all remaining issues to the Court of Appeals for proceedings consistent with this opinion.

**{53}    IT IS SO ORDERED.**

**JULIE J. VARGAS, Justice**

**WE CONCUR:**

**C. SHANNON BACON, Chief Justice**

**MICHAEL E. VIGIL, Justice**

**DAVID K. THOMSON, Justice**

**BRIANA H. ZAMORA, Justice**